(85 App. Div. 542.)

PEOPLE ex rel. CONSOLIDATED TELEGRAPH & ELECTRICAL SUBWAY CO. v. MONROE, Commissioner of Water Supply, Gas & Electricity of City of New York.

(Supreme Court, Appellate Division, First Department. July 7, 1903.)

1. GREATER NEW YORK—COMMISSIONER OF WATER SUPPLY, GAS, AND ELECTRICITY—SUCCESSOR OF BOARD OF COMMISSIONERS OF ELECTRICAL SUBWAYS.

The commissioner of water supply, gas, and electricity is the successor of the board of commissioners of electrical subways within the meaning of a contract between the board and a subway company, which provided that the company should reimburse the commissioners or their successors "for all reasonable expenses incurred by them in superintending and inspecting the construction" of all subways constructed thereunder, and which defined the term "successors" as including "any officer or officers of the city of New York who shall succeed to the powers and duties of the parties of the first part [the commissioners], or any part of such powers and duties, under the provisions of any law now existing or hereafter enacted by the said Legislature, or any other persons or

officers hereafter appointed or selected pursuant to any law to succeed to the powers and duties, or any part thereof."

2. SAME—POWERS OF COMMISSIONER—INSPECTION OF WORK DONE BY SUBWAY COMPANY.

Under the charter of Greater New York, which gives to the commissioner of water supply, gas, and electricity cognizance and control of the construction of subways, etc., and requires his permit in writing therefor, he is authorized to impose as a condition of granting the permit that the subway company bear all reasonable expenses of inspection, so far as his jurisdiction extends.

3. SAME—SALARY OF INSPECTORS.

One hundred dollars a month is not an excessive compensation for the services of the necessary inspectors.

Patterson and Hatch, JJ., dissenting.

Appeal from Special Term, New York County.

Mandamus by the people, on the relation of the Consolidated Telegraph & Electrical Subway Company, against Robert Grier Monroe, as commissioner of water supply, gas, and electricity of the city of New York, and another. From an order denying a peremptory writ directing the said Monroe to issue to relator unconditional permits to open streets in the borough of Manhattan for the purpose of constructing ducts for electrical conductors, relator appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Henry J. Hemmens, for appellant.
James Byrne, for respondent.

LAUGHLIN, J. The relator is a subway company incorporated in the year 1885 pursuant to the provisions of chapter 534, p. 647, Laws of 1884, as amended by chapter 499, p. 852, of the Laws of 1885 (further amended by chapter 503, p. 732, Laws of 1886), authorized by law to build, maintain, and operate subways or ducts for the reception for hire of high-tension electrical conductors for the electric light companies doing business in the borough of Manhattan, under a contract made on the 7th day of April, 1887, with the board of commissioners of electrical subways appointed pursuant to the provisions of chapter 499, p. 852, of the Laws of 1885, as amended by chapter 503, p. 732, of the Laws of 1886. This contract was ratified by section 6, of chapter 716, p. 929, of the Laws of 1887. The contract provides, among other things, that the relator "shall not open any street surface without first obtaining a permit therefor from the commissioner of public works, or other officer or department of said city vested by law with the control of the surface of the street to be opened, and giving to him or it such an agreement as he or it may approve and require for the proper restoration of the pavement of said street and the surface thereof, and for keeping the same in repair for one year after the same has been so replaced or restored." The contract further provides that the relator shall reimburse the commissioners or their successors "for all reasonable expenses incurred by them in superintending and inspecting the construction" of all subways constructed thereunder. It is the duty of the relator under the contract to construct additional subways as may be required for

the proper accommodation of all companies and corporations apply-
ing for the use thereof and being authorized to operate electrical con-
ductors in any street, avenue, or highway of the city. The relator is
about to construct 8 miles of additional subway and 40,860 feet of
ducts, involving 203 separate openings of the streets, by virtue of the
right conferred and duty imposed under the contract. The commis-
sioner of water supply, gas, and electricity claims to be the successor
of the original board of commissioners, and he refuses to grant a
permit for opening the streets and constructing subways therein un-
less the relator consents to the appointment of such inspectors as he
deems necessary upon the work, the inspectors to be paid by the re-
lator at the rate of $100 per month. The contract defines the term
"successors" of the commissioners as therein used as follows:

"The successors of the parties of the first part shall be construed to include
those who may succeed them as commissioners under the provisions of exist-
ing laws, or under the provisions of any law hereafter passed by the Legis-
lature of the state of New York, or any officer or officers of the city of New
York who shall succeed to the powers and duties of the parties of the first
part, or any part of such powers and duties, under the provisions of any
law now existing or hereafter enacted by the said Legislature, or any other
persons or officers hereafter appointed or selected pursuant to any law to
succeed to the powers and duties, or any part thereof, of said parties of the
first part."

The original act (chapter 499, p. 852, of the Laws of 1885) provided
that the work must be done pursuant to the rules and regulations
prescribed by the local authorities having control of the streets. By
chapter 716, p. 928, of the Laws of 1887, the title of the board was
changed to the "Board of Electrical Control," and the powers of the
original board were vested in it. Section 4 (page 929) of this act
required a permit in writing from the board or its successor for open-
ing the streets for such construction, and provided that the board
"may establish, and from time to time may alter, add to or amend all
and necessary rules, regulations and provisions for the manner of use
and management of the electrical conductors and of the conduits
theretofore constructed or contemplated under the provisions of this
act, or of any herein mentioned." Section 5 of this amendatory act
provided that the authority of the board of electrical control should
vest in the commissioners of the sinking fund from and after No-
vember 1, 1890. By subdivision 2 of section 573 of the Greater New
York Charter (chapter 378, p. 201, Laws 1897) the commissioner of
the department of public buildings, lighting, and supplies was given
"cognizance and control of" the making and execution of contracts
for lighting streets and of inspecting and testing gas and electricity,
gas meters, electric meters, electric wires, and of the use and trans-
mission of gas, electricity, pneumatic power, and steam for all pur-
poses "in, upon, across, over and under all streets, roads, avenues,
parks, public places and buildings; and of the construction of electric
mains, conduits, conductors and subways in any such streets, roads,
avenues, parks and public places, and the granting of permission to
open streets, when approved by the department of highways, and to
open the same and for the purpose of carrying on therein the busi-
ness of transmitting, conducting, using and selling electricity, steam,

or for the service of pneumatic tubes"; and section 586 required the board of electrical control to turn over and deliver to the commissioner of public buildings, lighting, and supplies "all maps, plans, models, books and papers relating to the construction and location of electrical conductors, conduits or subways filed with or communicated to said commissioner, and all official records and papers of every kind in their possession." Section 588, so far as material, provided that "all powers or duties conferred or imposed upon the corporation heretofore known as the mayor, aldermen and commonalty of the city of New York, or upon any of the officers, or upon any part thereof, or upon the board of electrical control in and for the city of New York," so far as the same related, among other things, to the matters specified in section 573, should be "conferred and imposed upon the city of New York as constituted by this act, and as a matter of administration are devolved upon the commissioner of public buildings, lighting and supplies, to be exercised, performed and executed, according to the provisions, directions, and limitations of this act." Subdivision 8 of section 524 of this act gave the commissioner of highways, who was created the head of the department of highways, among other things, "cognizance and control" of regulating, grading, repairing, paving, repaving, and otherwise improving the surface of public roads and walks, and of issuing permits to builders and others for using the surface of the streets; and section 525 prohibited the opening of any street by the removal of the pavement for any purpose whatever, except on the permit of the department of highways, and provided that, if the pavement is not properly restored, the commissioner of highways might give notice requiring its restoration by the person liable therefor, and, in default, he might do the work at the expense of the person whose duty it was to restore the pavement. This section further expressly provides that the commissioner is not prohibited from demanding a deposit of money or security as in his judgment might be necessary to pay the cost of properly relaying the pavement so removed, together with the expenses of inspection thereof, as a condition of issuing such permit. By subdivision 5 of section 469 of the amended charter of 1901 (Laws 1901, p. 207, c. 466) the commissioner of water supply, gas, and electricity is given "cognizance and control," among other things, of all matters over which the commissioner of the department of public buildings, lighting, and supplies had been given cognizance and control under section 573 of the Greater New York Charter, already quoted, and in substantially the same language. Section 531 of the same act required the former commissioner of public buildings, lighting, and supplies to turn over and deliver to the commissioner of water supply, gas, and electricity on the 1st day of January, 1902, "all maps, plans, models, books and papers and all official records and papers of every kind in his possession relating to the construction and location of electrical conductors, conduits or subways filed with or communicated to said commissioner." Section 528 of the same act provides as follows:

"It shall be unlawful, after the passage of this act, for any person or corporation to take up the pavement of any of the streets, avenues, highways or other public places of said city, or to excavate for the purpose of laying

underground any electrical conductors, of constructing subways, or of erecting poles, unless permission in writing therefor shall have been first obtained from the commissioner of water supply, gas and electricity with the written approval of the president of the borough within which it is desired to lay such conduits, erect such poles, or to construct such subways. No electrical conductors shall be strung, laid or maintained above or below the surface of any street, avenue, highway or other public place, in any part of said city without permission in writing from said commissioner therefor. And the said commissioner shall determine whether any extension of the existing electrical conductors of any person or corporation in said city shall be by means of overhead or underground conductors. The board of aldermen may establish, and may from time to time enact general ordinances regulating the construction, maintenance, use and management of the electrical conductors, poles and fixtures above ground, and the conduits and subways therefor constructed underground."

Section 383 thereof conferred upon the presidency of the borough, among other things, "cognizance and control" of those matters over which the commissioner of highways was given cognizance and control under section 524 of the Greater New York Charter; and section 391 forbids the opening of streets by the removal of the pavement for any purpose whatever until a permit therefor is obtained from the president of the borough, who is given the same power and authority in that matter, and in substantially the same language, as that conferred upon the department of highways and commissioner of highways under section 525 of the Greater New York Charter.

It appears that the president of the borough, acting under the authority conferred upon him to which reference has been made, has appointed inspectors, and it is claimed on the part of the appellant that the commissioner of water supply, gas, and electricity has no authority to appoint inspectors at the expense of the relator. The authority of the president of the borough to appoint inspectors is not directly presented by this appeal, which relates only to the power of the commissioner. We are of opinion that the commissioner is the successor of the board which made the contract with the relator, as such successor is therein defined, and that it is the duty of the relator to bear all reasonable expense of inspection. We are further of opinion that under the provisions of the present charter, which give the commissioner cognizance and control of this and other specified underground work, and require his permit in writing therefor, that he is authorized to impose, as a condition of granting the permit, that the relator should bear all reasonable expense of inspection so far as the commissioner's jurisdiction extends. Without definitely deciding the question, which, as has been stated, is not presented, it would seem that the president of the borough is responsible for the condition of the surface of the streets, and it is his duty to maintain the same in a safe condition for public travel. It is his duty, therefore, and not the duty of the commissioner, to see that excavations are properly guarded, and that the trenches are properly refilled, and that the pavement is properly relaid. The plans for subway construction are required to be approved by the commissioner, and upon him, therefore, devolves the duty of seeing that the subways for electrical conduits are properly constructed for the safety of the public and of other improvements, so far as the same

may be affected by the use of the subways for transmitting electricity, and to insure convenient access to other underground improvements, and enable the construction of the necessary subsurface works or improvements. To this end, we think, he not only has the right, but it is his duty, through competent inspectors, to exercise this supervision over the location and construction of the subways. It was clearly competent for him to provide that his permit should be null and void if the plans with reference to the location and manner of construction of the subways should not be followed. He has implied authority, therefore, to impose as a condition of granting the permit that the relator should bear the reasonable and necessary expense of such inspection.

The only remaining question is whether the conditions imposed by him are reasonable. It does not appear that the city has provided funds which may be used in the first instance to defray this expense. With work of this magnitude it seems reasonable that inspectors should be appointed upon monthly compensation. It is not contended, and we cannot infer, that a salary of $100 a month is excessive compensation for such services. In these circumstances the commissioner cannot be compelled by mandamus to grant an unconditional permit, and we think the relator should have accepted the permit tendered, and then, if there should be any abuse of the reserved right to appoint inspectors at the expense of the relator, the relator could present the question by refusing to pay the inspectors whose services were claimed to have been unnecessary.

It follows that the order should be affirmed, with costs.

VAN BRUNT, P. J., and INGRAHAM, J., concur. PATTERSON and HATCH, JJ., dissent.